TRINA A. HIGGINS, United States Attorney (#7349)
CY H. CASTLE, Assistant United States Attorney (#4808)
SIRENA MILLER WISSLER, Assistant United States Attorney (#7450)
JOEL A. FERRE, Assistant United States Attorney (#7517)
Attorneys for the United States of America
111 South Main Street, Suite1800
Salt Lake City, Utah 84111
Telephone: (801)-524-5682

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>GABRIEL SETH ELSTEIN, et al.,<br><br>    Defendants. | Case No. 2:18cr99<br><br>RESPONSE OF UNITED STATES TO DEFENDANT GABRIEL ELSTEIN'S AMENDED SENTENCING MEMORADUM<br><br>Judge Clark Waddoups<br><br><span style="color:red">FILED UNDER SEAL</span> |

The United States provides this response to the Defendant Gabriel Elstein's

Amended Sentencing Memorandum ("Sentencing Memorandum") (ECF No.285) for the

reason that it did not have access to the information about the defendant's history and

characteristics described in his Mitigation Report and Sentencing Memorandum until

after the United States filed its sentencing memorandum.[1]

---

[1] Pursuant to Local Criminal Rule 49-2(c)(3), the United States has filed this response under seal "without a motion or prior approval from the court" because it contains "sensitive, confidential, or personal information for or about a defendant." This response references co-defendant Dale Gordon's cooperation in this case.

## INTRODUCTION

Defendant Gabe Elstein is in the entertainment business and knows how to put on a performance.[2]  He is a wealthy man and lives in Summit County, the county with the highest average income in all of the state of Utah.[3]  He has the resources to throw the proverbial "kitchen sink" at attempting to convince this court he is deserving of a probationary sentencing notwithstanding that he was a king-pin, a leader and organizer, of an eight-year drug and money laundering conspiracy, distributing 5,000 pounds of marijuana to four different states – Utah, Minnesota, Wisconsin and Illinois -- and grossing $10,000,000 in illegal drug proceeds that he turned into a successful entertainment business providing him with $72,000 in monthly income.

Since his indictment, Gabe Elstein has been about orchestrating a carefully thought-out strategic plan to avoid prison.  He blames others for his criminal conduct or excuses the consequences of his criminal conduct because others desperately depend upon him.  His claim that he only cares about those who depend upon him is nonsense. What he cares about is going to prison as anyone would.  If he truly cared, he would have a backup plan for those who depend upon him in the event he goes to prison.  Everyone he claims depends upon him are his hostages and they know it.  The genuineness of his "I

---

2 Gabe Elstein plans on using a professionally prepared video of his supporters at his sentencing hearing, including an appearance of a local celerity and former football coach of the University of Utah, Ron McBride.  It should also be noted that one of the supporters is a person who is alleged to have purchased marijuana from Gabe Elstein for street distribution.

3 Where do Rich People live in Utah, https://www.abc4.com/news/local-news/where-do-the-rich-people-live-in-utah/

only care about others" can only be measured by having a Plan B.  A person who has truly been transformed from a career as a criminal would have a backup plan.

He argues the court should not sentence him to prison because he, and only he, can take care of his children and his business, has engaged in charitable works, joined the conspiracy without a fully developed cerebral cortex and was tricked by his co-defendant, Dale Gordon, would suffer an unwarranted sentencing disparity compared to Dale Gordon's sentence and has suffered sufficient punishment already with his forfeiture payment and the bad publicity of his indictment.

However, the defendant is (1) relying primarily on factors to justify a departure from the sentencing guideline range of 87 to 106 months to a probationary sentence that are considered "discouraged factors" for sentencing outside the guideline range and (2) relying upon collateral consequences of his criminal conduct that are impermissible factors for the court to consider in sentencing him to probation.  The Supreme Court addressed this issue of discouraged factors and the standard defendants must overcome to justify a court's reliance on discouraged factors for a departure in *Koon v. United States*, 518 U.S. 81, 95 (1996):

> Discouraged factors, by contrast, are those "not ordinarily relevant to the determination of whether a sentence should be outside the applicable guideline range." 1995 U.S.S.G. ch. 5, pt. H, intro. comment. Examples include the defendant's family ties and responsibilities, 1995 U.S.S.G. § 5H1.6, his or her education and vocational skills, § 5H1.2, and his or her military, civic, charitable, or public service record, § 5H1.11. The Commission does not view discouraged factors "as necessarily inappropriate" bases for departure but says they should be relied upon only "in exceptional cases." 1995 U.S.S.G. ch. 5, pt. H, intro. comment.

3

Gabe Elstein has failed to satisfy the high exceptional requirement of *Koon* to justify this court departing from the sentencing guideline range of 87 months to 106 to a probationary sentence.

## ARGUMENT

### *The Three Elstein Children*

Gabe Elstein's first claim for why the court should sentence him to probation is that his estranged wife, Angela Elstein, is not capable of caring for their three children if he was sentenced to prison.[4]  As shown in is Sentencing Memorandum, he has made a considerable effort to gather evidence that only he can be the forever custodial parent for their three children.  He has involved his friends, family, employees of The Complex, even his fourteen-year-old boy and twelve-year-old girl,[5] and a hired mitigation specialist believing that the more people who say derogatory things about Angela the better his chances are of not going to prison.  The Mitigation Report[6] states:

> Angela reverted to being a single woman, free to do whatever she chose.  Her lifestyle began to revolve around drinking and partying and the low-life men, some of which were felons[7], who accompany her.

> When Gabe's children became reluctant to spend time at Angela's home, he was gravely concerned for their health and well-being.  He went to her home to assess the situation.  He was appalled by the living

---

4 Accusations between divorcing parents about parental fitness are not uncommon.

5  The two children appear in Gabe's sentencing video.

6 What is the role of the Mitigation Report?  Is it intended to replace the PSR, to be an addendum to the PSR or a piece of advocacy and legal opinions from someone not license to practice law in Utah?

7 Such a characterization of these men is curious since Gabe Elstein has now joined the ranks of a convicted felon.  Do we label all convicted male felons low-life men?

conditions.  Clothes, boxes, and toys strewn so heavily that piles covered the beds, furniture, and most of the carpet.  The floor was littered with dog feces, and there was a pungent smell of urine throughout the house.

Angela's disinterest in the children was hard enough to handle, but her disgusting home was unacceptable.  Gabe could not allow his children to live in such putrid and dangerous conditions. [8]

Admittedly, based upon this description of Angela's conduct, it is understandable that Gabe Elstein felt like he faced a three-alarm fire when it came to his children and he would need to do whatever it took to protect them.  However, only now when Gabe Elstein faces sentencing does he make public in his Sentencing Memorandum his salacious allegations against Angela.  But prior to this, did he call the police?  No, he didn't.  Did he call the Utah Division of Child and Family Services?  No, he didn't do that either.  Did he report Angela to the state district court judge in his pending divorce case?  No, he didn't.  Did he seek the appointment of a Guardian Ad Litem?  No, he didn't.  Did he seek a court order in his divorce case to obtain full custody of his children?  No, he didn't.  Did he call Angela's pretrial/probation officer to report her conduct.[9]  No, he didn't.

What did he do?  Gade did the opposite: he filed a notice of intent to dismiss the divorce case -- the very forum where parenting issues and the best interest of the children

---

8 Because the Mitigation Report doesn't identity who is the source of this information about Angela, one can only assume that defendant Gabe Elstein is the source.

9 Cameron Sinner has stated that one of the most common calls he receives is from parents of children complaining about parents under his supervision for failing to meet their parental obligations.

could be properly addressed by a court with the experience and expertise in handling these kinds of matters.  The divorce case is now just sitting there, doing nothing.

Gabe Elstein has failed to do what any reasonable parent would have done if, in fact, Angela's conduct supports his claim she is forever-broken mother and only he can properly raise their children.  The reason he has done nothing is obvious:  he knows he could never prevail on a claim that Angela is an unfit parent.  He acknowledges the problems Angela is having are new because they have had "a great co-parenting relationship."[10]  If she is so unfit, then why do the children spend any time with Angela?  "They [the children] occasionally spend time with Angela."[11]

He claims that "he does not feel that they [Gabe Elstein and the children] should lose their love for one another and hopes Angela can recover soon."  However, his public comments and private comments to his children about Angela's fitness are reflected in the comments from their 14-year-old son -- and completely contrary to any effort to maintain a loving relationship with Angela.

> Angela is only involved with her children when it is convenient for her.  She has the façade of being a good mother but her frequent violations of her probation tell a different story.[12]

---

10 Sentencing Memorandum at 4.

11 Mitigation Report at 6.

12 Gabe Elstein's argument is that because Angela has had some probation violations that makes her a bad parent. It should be noted that Angela had no pretrial violations from April 2018 until October 10, 2023.  She was tested 23 times between those dates and 23 times without a positive drug test.  Her first positive test was October 10, 2023 for marijuana.  It should also be noted that Angela has only been on probation since October 2023.

But the criticism of Angela doesn't just come from Gabe Elstein.  Urijah, their fourteen-year-old boy, provided a statement in the Mitigation Report about his mother that would be devasting for any parent to hear:

> She [Angela] isn't capable of taking care of three kids.  She avoids us.  If my dad asks her to pick us up from school, she makes excuses and tries to get out of it most of the time.  But, if she is around her friends, she pretends to be a "dream mom."[13]

What seems lost from Gabe Elstein's public criticism of Angela is that the children need their mother as much as they need him.[14]  He cannot now use Angela's conduct for which he is responsible to justify a probationary sentence.

When Angela met Cameron Sinner, her probation officer, in January of 2024 at her home, she told him their children would be spending more time with Gabe Elstein in anticipation that he might be sentenced to prison.  In fact, all three children were at her

---

13 Mitigation Report at 7; It is hard to believe that Urijah's comment was made independently from the way Gabe Elstein feels and talks about Angela.

14 What also seems lost on Gabe Elstein is that he seeks extraordinary leniency from the court but isn't willing to show any leniency for his estranged wife.  Angela is a victim as well as the children are of Gabe Elstein's criminal conduct.  Her mental health challenges are directly related to Gabe Elstein's criminal conduct.  She would not have been involved in this case as a defendant but for Gabe.  As described by Gabe's Mitigation Report,

> The criminal charges sent waves of devastation through Gabe, his family, and *The Complex*.  Media articles related to Gabe and Angela's indictment for marijuana distribution and money laundering tarnished their professional reputations and threaten to close The Complex.  The massive publicity surrounding this case impacted *The Complex's* livelihood, causing significant distress for Gabe and his family.  *The pressure of losing everything and the possibility of incarceration wreaked havoc on Angela's mental health.* (Emphasis added).  Their marriage began to deteriorate as they withdrew from each other to cope with the uncertainty of their future.

> Gabe and Angela suffered the final devasting blow to their marriage two year later with the pandemic forced them to close The Complex.

*Id.* at 6.

home at the time of Cameron's visit.  While her home was cluttered, he found no evidence of dog feces or the odor of urine.

Terrah Lund, a close friend of Angela's, has stated that Angela regularly picks up the children from Gabe Elstein's house to take them to school and picks them up after school and the two younger children are routinely at her home.  On one occasion, Terrah had called Angela and Angela said she would have to call her back because she was lying down with her youngest child, Olivia.

Terrah has also expressed to her personal support and the support of her foundation, "I Can do Hard Things," and the support of other moms in the Park City community for Angela.  After Angela's detention hearing on September 13th, Terrah wrote a letter to Judge Bennett pledging her foundation's financial support for treatment at the Huntsman Mental Health Institute.

At the time Deputy Marshal Manny Scott arrested Angela on September 5, 2024, she stated she was on her way to pick up her children from volleyball and had to call to make other arrangements.  The first person she called was defendant Gabe Elstein, but he didn't answer.

This additional information explains why Gabe Elstein did none of the things a reasonable parent would have done to support his claim that only he can parent their three children.  Despite the challenges currently Angela faces, she remains an active participant in the lives of her children and capable of raising them in the event he is sentenced to prison.

8

Recently, Patrick P. Adams, a Forensic Social Worker/Therapist, interviewed Angela and has preliminarily determined that Angela does not meet the diagnostic criteria for Substance-Use-Disorder, but does meet the criteria for Post Traumatic Stress Disorder, Generalized Depression and Generalized Anxiety disorders and Adult Attention Deficit Disorder. Mr. Adams plans to complete a more comprehensive assessment and create an appropriate treatment plan for Angela. Angela was released today from custody so she can receive a more comprehensive assessment and participate in a treatment plan.

The lay and biased opinions from Gabe Elstein's family, friends and employees that only he can raise the children can hardly be considered an appropriate substitute for the expert opinion of a family and child psychologist this court would need to conclude that Gabe Elstein has met the exceptional requirement that sending him to prison will result in a loss of caretaking support that substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant.[15] Citing publications in the mitigation report about the effects of incarcerating parents is insufficient. The arm-chair opinion from the mitigation specialist that "Angela would not be a suitable custodian for the children"[16] should Gabe Elstein go to prison is of no more value to the court than the lay opinions from his family and friends. Conspicuously missing from the Mitigation Report is the mitigation specialist's curriculum vitae. There is no evidence that she is qualified as an expert to opine about the suitability of parents.

---

15 Application Note 1B(i) and (ii) to §5H1.6.

16 Mitigation Report at 7.

9

*Gabe Elstein's Cerebral Cortex*

Now, for the first time and only after he plead guilty, Gabe Elstein claims he is only "guilty-ish" for his criminal conduct because he was a mere 21 year old when he conspired with Dale Gordon to commit eight years of drug trafficking and money laundering crimes for two reasons:  First, studies over the last twenty-five years have shown that people between the ages of 18 and 25 do not have a fully developed cerebral cortexes, *Gall v. United States*, 552 U.S. 38, 58 (2007), and without one, they are prone to impulsive and risky behavior.  In other words, it's not Gabe Elstein's fault he was Utah's own drug lord, but his cerebral cortex's fault.

Second, because of Gabe Elstein's youth, Dale Gordon beguiled him into joining the conspiracy because he was "a charismatic and convincing drug dealer and businessman."[17]  Once again, it's not his fault, but Dale Gordon's as his menacing mentor.

The development of a person's cerebral cortex is like going through puberty; it develops at different times in a person's life.  "[T]here is no bold line demarcating at what age a person reaches full maturity."  *Gall*, 552 U.S. at 58.  The cerebral cortex is responsible for higher-level processes of the human brain, including language, memory, reasoning, thought, learning, decision-making, intelligence and personality.  We don't know when Gabe Elstein's cerebral cortex was fully developed because we have no way

---

17 Sentencing Memorandum at 7.

of looking into his brain after the fact to measure its rate of development.  But what we do have in this case is outward evidence that Gabe Elstein's cerebral cortex was sufficiently, if not fully, developed not to justify any departure from the guidelines based on his age in this case.  He admitted in his plea agreement to playing an aggravating role as a leader and organizer in the eight year conspiracy.[18]  The first question to ask is: how can someone be a leader and organizer of a multistate drug trafficking conspiracy without a sufficiently developed cerebral cortex since participating in that role would have required the executive functioning of the  cerebral cortex? [19]  Executive functioning includes, among other things, self-restraint, emotional control, planning/prioritization, organization, time management defining and achieving goals.[20]  Gabe Elstein has provided us that answer by specifically admitting in his plea agreement that his cerebral cortex was fully engaged in executive functioning throughout the conspiracy in his aggravated role as a leader and organizer of the eight-year drug conspiracy:

---

18 Gabe Elstein's SAP at 5 (ECF No. 253).

19 Application Note 4 to 3B1.1 states:

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, his claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

20 Cleveland Clinic, Cerebral Cortex: What It Is, Function & Location, https://my.clevelandclinic.org> health > articles > 2307.

By at least April 2007, and continuing through October 2014,[21] I knowingly and intentionally conspired with defendants Dale Gordon, Angela Elstein, Robert Viets, David Justice; and a number of others to distribute during this period of time more than 5,000 pounds of marijuana, a Schedule I controlled substance.

My role as one of the leaders and organizers of the conspiracy was to purchase sizable quantities of marijuana for distribution from wholesale marijuana suppliers in northern California; recruit and coordinate with marijuana-load drivers to deliver marijuana from California to Salt Lake City, Minnesota, Illinois and Wisconsin; recruit and coordinate with retail distributors in these locations to sell marijuana; and arrange and coordinate the return of the marijuana sale proceeds to the co-conspirators.  This drug conspiracy generated approximately $10,000,000 in gross marijuana proceeds.

But his executive functioning cerebral cortex wasn't limited to the drug side of the conspiracy; Gabe Elstein was also a leader and organizer of the money laundering side of the conspiracy.  He admitted in his Mitigation Report and plea agreement that he was a leader and organizer.  For example, Gabe Elstein states in his Mitigation Report he agreed to invest marijuana proceeds – $1.3 million -- into The Complex:

In 2009, Dale and a business associate, Ian Morehouse, the owner of Saltaire, joined to build a new concert venue in Salt Lake City called *The Complex*.  Gabe agreed to invest in the idea, and their marijuana business provided some financial backing of the project. . . As the construction progressed, the cost increased far beyond what was initially quoted.  Gabe agreed to continue investing to complete the project and relinquished his profits from the marijuana sale to Dale.[22]

His plea agreement states:

---

21 Apparently, Gabe Elstein now wants to claim the conspiracy began in 2006, and not "[b]y at least by 2007" so he can argue he was only 21 years old instead of 22 ½ when he entered into the conspiracy.

22 Mitigation Report at 4.

1. *The Complex*

Beginning in 2009 and continuing to September 2010, defendants Dale Gordon, Angela Elstein and I began building a music venue called, "The Complex." The cost of the construction was at least $1,300,000. Of this amount, approximately $400,000 came from marijuana cash proceeds previously laundered through Bondad Productions and The Complex bank accounts. The remaining amount of approximately $900,000 was marijuana cash proceeds paid directly to those companies and individuals related to the construction.

The Complex buildout purchases were comingled with marijuana drug money. The builder of The Complex was paid in large quantities of marijuana cash. The marijuana cash paid to the builder was generally shrink-wrapped in $50,000 cash increments made on almost a weekly basis.[23]

As another example, Gabe Elstein admitted in no uncertain terms in his plea agreement that he and Dale shared the decision-making authority on how to promote the marijuana business by using the marijuana proceeds:

We [Dale and I] used the marijuana sale proceeds to (1) purchase more marijuana to distribute; (2) purchase and operate grow properties in California; (3) pay for distribution expenses; (4) purchase automobiles; (5) pay for marijuana-load drivers; (6) pay retail distributors; (6) pay for warehousing large quantities of marijuana in Salt Lake City; (7) pay for transportation expenses; (8) pay for building renovations to The Complex; (9) and financially support Dumbles Holdings, Bondad Productions and The Complex until these businesses could support themselves. Between 2006 and 2014, my primary source of income came from the marijuana trafficking business.[24]

In addition, he admitted he had decision making authority over how he and Dale shared the illegal drug proceeds:

---

[23] Gabe Elstein Elstein's SAP at 6.

[24] *Id*. at 7.

13

> I would meet with defendant Gordon before these deposits
> [marijuana proceeds] were made to decide how to split the money.  The
> cash deposits were broken up as owner equity over the course of a tax year
> so there would not be a huge cash dump into bank accounts at the end of
> the year.  In addition, it was important to show on the ledgers we
> individually keep large amounts of cash on hand as money earned, taxed
> and paid to us to explain why we had large amounts of cash if we ever were
> caught.[25]

He further admitted to receiving the largest share of the illegal marijuana proceeds

by purchasing with marijuana money in 2011 the Hill Top property, valued at about

$1,300,000 in Park City, Utah; and in 2012 the Tall Oaks property valued at $3,000,000,

in Park City, Utah.[26]

In support of his cerebral cortex argument, Gabe Elstein relies upon the Supreme

Court case of *Gall v. United States*, 552 U.S. 38 (2007).  However, his case is not the

*Gall* case.  Gall joined a conspiracy to distribute ecstasy while a second-year college

student to deliver ecstasy pills among other co-conspirators for sale to consumers.  He

earned over $30,000.  Two months after joining the conspiracy he stopped using ecstasy

and after seven months, he informed the other conspirators he was withdrawing from the

conspiracy.  He then graduated from college, moved to Arizona to work in construction

and then to Colorado to work as a master carpenter.  He was indicted 3 1/2 years after he

withdrew from the conspiracy.

---

25 *Id.*

26  *Id.* at 8.

In Gabe Elstein's case, he was a kingpin, a leader and organizer of the marijuana and money laundering conspiracies. Gall was not; he was only a runner. Gall's presentence report specifically concluded that Gall "was not an organizer, leader or manager." *Id.* at 43. Gall was using drugs during the first two months of his involvement in the conspiracy; Gabe Elstein has denied any regular drug use during his conspiracy. He isn't the one who withdrew from the conspiracy, it was Dale Gordon. Gall was a low-level member of drug conspiracy for seven short months; Gabe Elstein was a key-member of an eight-year-long conspiracy. Gall withdrew from the conspiracy when he was still a second-year college student. Gabe Elstein's involvement in the conspiracy continued until he was 30 years old. He earned $10 million.

Gall engaged in no further criminal conduct or drug use after withdrawing from the conspiracy. Not Gabe Elstein. In March of 2018, agents found a pay/owe sheet in his garbage and more than a pound of marijuana, scales, packaging materials and air filter in his home – all evidence of continued drug trafficking. David Justice, Gabe Elstein's co-defendant and marijuana supplier in this case, was also at Gabe's home at the time of the search warrant.

Prior to the search of Gabe Elstein's home, he was indicted for conspiracy to distribute marijuana on February 15, 2018 along with Dale Gordon. Gabe Elstein was subsequently sent a summons to appear in court on April 2, 2018 for his first appearance. Any claim by him of self-motivated rehabilitation after the 2014 conspiracy is a hollow

claim.  Unlike Gall, any rehabilitation Gabe Elstein has undertaken was directly motived after his first appearance on his indictment on April 2, 2018.

### *It's Dale Gordon's Fault*

Gabe Elstein's efforts to blame his cerebral cortex for being only "guilty-ish" does not end there.  Now for the first time, he blames his co-defendant, Dale Gordon.  He blames Dale because he ostensibly has an irresistible personality and was a "convincing drug dealer and businessman."[27]  However, there is no evidence in this case that Dale was a "convincing drug dealer" before they met; he wasn't a drug dealer before meeting Gabe, Gabe was.  Dale has no history of selling marijuana or any other drug for that matter until after he met Gabe.

Gabe Elstein has admitted to his mitigation specialist he was in the business of being a marijuana drug dealer for years before meeting Dale.  Gabe's Mitigation Report states that after he graduated from high school, he "began selling small amounts" of marijuana and . . . "he was good at it, giving him a false sense of financial security."[28] Gabe's childhood friend, Richmond Tyrell, confirmed to the mitigation specialist Gabe Elstein was in the marijuana drug business as a teenager.

> As a teenager, Gabe had a lot of drive and motivation to change these circumstances and not end up like his parents. He was always trying to build a business and make money to establish something better for himself. *Selling marijuana was a way for him to do that*.  (Emphasis added). [29]

---

27  Sentencing Memorandum at 7.

28  Mitigation Report at 2.

29  *Id.* at 3-4.

If that is not enough, Gabe Elstein admitted in his PSR that before he met Dale, he

owed a $40,000 marijuana debt for 20 pounds of marijuana. [30]  Only someone in the

business of selling marijuana could owe $40,000 for marijuana.  Gabe's PSR clearly

states:

> Sometime in 2006, Scott Dale Gordon was introduced to Gabe Elstein at a
> birthday party.  At the birthday party Mr. Gordon, Mr. Elstein and B.Z.
> went to the Olive Garden restaurant where they discussed marijuana
> trafficking.  During their meal, Mr. Gordon agreed to provide Mr. Elstein
> with $40,000 to pay an existing marijuana debt and to purchase more
> marijuana for distribution. [31]

Gabe Elstein was the one who had the long-standing drug connections, not

Dale.  Dale brought his business experience of legitimate businesses to the

conspiracy, which is why Gabe Elstein stated in his Sentencing Memorandum that,

"Together, Dale and Gabe were a good fit."[32]

*Charitable Works*

The sentencing guidelines discourage downward departures from the guidelines

for charitable works.  A departure for charitable works is permitted only when they are

exceptional.  The issue is not "whether . . . [Gabe Elstein] "engaged in 'good works', . . .

"but whether the works are exceptional enough to overcome the judgment of the

---

30 The price per pound for marijuana at the time of the conspiracy was $2,000.

31 PSR at ¶ 14.

32 Sentencing Memorandum at 8.

Sentencing Commission that a record of good works is a discouraged basis for departure – that is, good works are 'not ordinarily relevant' to the decision whether to depart from the guidelines." *United States v. Thurston*, 358 F.3d 51, 79 (1st Cir. 2004). "[T]he 'exceptional case hurdle' for discouraged departures is a very high one." *Id.* at 80. It is not a matter of quantity but the context of a defendant's good works. Gabe Elstein's position as a wealthy and successful businessman plays into this analysis. Because of his wealth, he is better suited to make time and financial contributions to the community "than someone from whom [time] and expenses of day-to-day life are more pressing." *Id.* Those who have the time and financial wherewithal to donate "should not gain advantage over those who do not make such donations because they cannot." *Id.*; *See United States v. Morken,* 133 F.3d 628, 629–30 (8th Cir.1998) (reversing a downward departure because the defendant's good works were not exceptional in light of his income and preeminence in a small town).

In *Morken*, the defendant had a second business that hosted horse shows, farm and home shows and it provided jobs and revenue for local businesses. But the Eight Circuit saw this business just like any other ongoing business and it was not evidence of anything unusual about the defendant's entrepreneurial skills.

Nor did the court see the defendant's service to the community as exceptional even though he was an accommodating neighbor, a good friend, advised local business owners, hired young people, served on his church council, raised money for charity and the largest cattle broker because his good works were "neither exceptional nor out of the

ordinary for someone of his income and preeminence in a small Minnesota town with a population barely over a thousand." *Id.* at 630.

The court further noted the district court's comments about "people of this town 'have come to depend on you' and 'the republic and your community would be better served . . . by permitting you to aid a small, struggling rural community . . .' suggested that the real reason for the district court's departure was economic injury to innocent third parties, a discouraged basis for departure [under] § 5H1.6." *Id.*

Volunteering for a cancer foundation, coaching his son's football team and using The Complex to raise money for cancer patients and for Coach Ron McBride's foundation is what would be normally expected of a person with Gabe's wealth.

Moreover, the cases he has cited illustrate that he has not met the exceptionally good works standard to justify a departure from the guidelines.  In *United States v. Warner*, 792 F.3d 847 (7th Cir. 2015), the defendant's charitable acts included offering to mentor students in business and product development at three urban high schools on Chicago's South Side, paying $20,000 to a women he met on the street who suffered from kidney failure and needed money for expensive stem cell treatment, helping this women raise awareness and connected her with others interested in the potential of adult stem cells for treating kidney failure, donating for over 13 years millions of plush toys valued at over $70 million to enable numerous charitable projects, donating $20 million to a memorial fund in honor of Princess Diana, donating $2 million for cancer research, donating $6.3 million to a charter school in Las Vegas and donating $2 million for

19

disaster relief in Japan.  *Id.* at 852-853.

Most of the charitable work the defendant performed took place long before he knew he was under investigation and was 'done quietly and privately', "motivated by the purest of intentions and without a view toward using [them] at sentencing."  *Id.*  Gabe's charitable work of coaching football and raising money for Coach McBride occurred after he was indicted and motived with the view of using them at sentencing.

In *United States v. Cooper*, 394 F.3d 172, 177 (3rd Cir. 2005), the defendant organized and ran a youth football team in a depressed area of Pittsburgh.  He mentored those who played football.  He paid for four of the players to attend a suburban high school where they would find better opportunities.  He helped one of the boys attend the University of Pittsburgh to play football and when he didn't get enough playing time, helped the student transfer to another school where he could play football.  The student graduated after a successful four years of athletics and academics and attributed his success to the defendant.  While Gabe Elstein has coached his son in little football team in Summit County for the Park City Miners, he hasn't organized and run any youth football teams in any economically depressed areas of Summit County.  Nor has he paid for any players to attend better schools or helped any players go to and graduate from college.  Admittedly, he hasn't had to since Summit County has the highest average income of any county in Utah and the children living in the county, particularly in Gabe's neighborhood with his $3 million house, will likely have all the advantages of life handed to them that wealth brings.

20

In *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D. N.Y. 2006), the court received letters,

> from friends and family detailing the numerous acts of compassion and generosity that date back to the defendant's childhood and have continued to the present. Not only friends, but also prominent business colleagues (such as the chairman of a large public company), educators (such as a Harvard dean), lawyers, doctors, accountants, health care specialists, clergymen, policemen, and other people whose lives were touched by the defendant's acts of kindness.

*Id.* at 513.

The defendant's good deeds 'were not performed to gain status or enhance his image. Most of them were unknown to all but a few people until the time of his sentencing." *Id*.

Gabe Elstein's charity work doesn't compare to the exceptional charity work of the defendants in *Warner, Cooper* and *Adelson* performed in their lives. Because his charity work doesn't not meet the high burden of exceptional, he isn't entitled to a downward departure from the guidelines.

<u>*Unwarranted Sentences*</u>

Section 3553(a)(6) requires a sentencing court to avoid unwarranted sentences among similarly situated defendants. While different sentences might create disparity among similarly situated defendants, the question is whether they are unwarranted disparities under the circumstances. Gabe Elstein complains that the 48-month sentence the United States is recommending creates an unwarranted sentencing disparity with Dale Gordon's Rule 11(c)(1)(C) plea agreement that outlines an agreed upon sentence of zero

21

to thirty-six months.  In particular, he claims that as part of the plea agreement, the United States agreed that Dale was safety value eligible under § 5C1.2 to avoid the ten-year mandatory minimum sentence for his guilty plea to Count 1, Conspiracy to Distribute Marijuana, and Count 2, Conspiracy to Commit Money Laundering, of the Second Superseding Indictment.  However, Gabe's complaint about Dale Gordon is sentence is premature; he has yet to be sentenced.  As with all 11(c)(1)(C) plea agreements, the court must determine whether the 11(c)(1)(C) plea agreement is a reasonable sentence, though that is difficult to do since Dale has yet to be sentenced.  The court can reject the plea agreement if it believes the sentence is unreasonable.

The irony of Gabe Elstein's complaint is that his plea agreement, though structured differently, achieved the same result as was achieved with Dale's plea agreement: avoiding the mandatory ten-year sentence under 21 U.S.C. § 841(b)(1)(A). Gabe Elstein plead guilty to Count 1, Conspiracy to Distribute Marijuana, of a Felony Information without the statutory ten-year mandatory minimum notice even though factually he was subject to that penalty because he distributed 5,000 pounds of marijuana. As a result, Gabe Elstein can argue, as he is doing, that he is entitled to a probationary sentence because he no longer faces a ten-year minimum sentence in this case.

Even assuming the sentence Dale receives is less than the sentence Gabe Elstein receives, the disparity is warranted.  Unlike Gabe, Dale has signed a cooperation agreement with the United States.  He began his cooperation with the United States shortly after his first appearance.  His cooperation included multiple meetings with law

enforcement and the production of numerous corroborating documents and records.  It is the belief of the United States that the other defendants and Gabe Elstein plead guilty because of Dale's cooperation.

But Gabe Elstein never agreed to cooperate.  In fact, after he had agreed to meet with law enforcement on two occasions about the case, he cancelled those meetings. When he did finally meet with law enforcement, it was not until February 7, 2020 – two years after he was indicted – and failed to provide any information that law enforcement didn't already have from Dale.

### Already Punishment Enough

Without citing any authority, Gabe Elstein claims as another reason why he should be sentenced to probation is that he has already been sufficiently punished because he paid his $10 million forfeiture obligation and because of the damaged caused to The Complex by the publicity of his indictment.  However, forfeiture and publicity are not issues for the court to consider in fashioning a sentence for the defendant.

"The federal Sentencing Guidelines do not apply to the forfeiture aspect of a defendant's sentence."[33]  A defendant who "has been ordered to forfeit property in a criminal case is not a basis for a downward departure under the Sentencing Guidelines. *See* § 5E1.4.[34]

---

33  Stepan A. Cassella, Asset Forfeiture Law in the United States § 20-6 (3rd ed. 2022).

34 *Id.*

The Tenth Circuit, as well as other courts, has affirmed the legal principle that forfeiture does not result in a downward departure in sentencings.  In *United States v. Coddington*, 118 F. 3d 1439 (10th Cir. 1997), the defendant appealed the district court's decision denying her motion to downward depart from the guideline sentencing range for her drug conviction under § 3553(b) and § 5K2.0 because her personal property had been forfeited.  She argued that because the effect of forfeiture is not discussed in the Sentencing Guidelines, "forfeiture constitutes a 'mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different that described." (citation omitted).  *Id*. at 1440.

In rejecting her argument, the court noted that "§ 5E1.4 provides that '[f]orfeiture is to be imposed on a convicted defendant as provided by statute.'  It further noted that "the Third, Fourth, Seventh and Ninth Circuits have all held that forfeiture of a defendant's property does not constitute a basis for a downward departure under § 3553 and § 5K2.0" and cited the supporting cases from these circuits:

> *United States v. Shirk,* 981 F.2d 1382, 1397 (3d Cir.1992) ("We interpret the Guidelines' straightforward mandate that 'forfeiture is to be imposed ... as provided by statute' to mean that the Commission viewed monetary forfeiture as entirely distinct from the issue of imprisonment."), *vacated on other grounds,* 510 U.S. 1068, 114 S.Ct. 873, 127 L.Ed.2d 70 (1994); *United States v. Weinberger,* 91 F.3d 642, 644 (4th Cir.1996) ("Reducing a sentence based on a defendant's exposure to forfeiture would link the precise matters that the Commission intended to keep separate."); *United States v. Hendrickson,* 22 F.3d 170, 175 (7th Cir.1994) ("[W]e find that the Sentencing Commission adequately considered both the possibility of statutory forfeiture and degree of hardship a forfeiture could work when constructing the Guidelines."); *United States v. Crook,* 9 F.3d 1422, 1426

24

(9th Cir.1993) ("By considering forfeiture in § 5E1.4 but not providing that forfeiture may be considered in setting a term of incarceration, the Commission indicated that forfeiture and incarceration are to be considered separately.").

*Id.* at 1441.

The court further observed that:

In reaching this conclusion, several of these courts have observed that the fact that a defendant's property has been forfeited does not demonstrate the reduced culpability that might warrant a reduction in a defendant's sentence.  *See Weinberger,* 91 F.3d at 644; *Hendrickson,* 22 F.3d at 176.

*Id.*

Based upon established circuit case law, Gabe Elstein is not entitled to a downward departure because he forfeited $10 million to the United States.  Lest we forget that the $10 million represents the gain Gabe Elstein received as a result of his criminal conduct, wealth he would not have had but for the marijuana proceeds generated from the conspiracies.  The $10 million payment was simply intended to restore the status quo before Gabe Elstein entered into the conspiracy.  He had the option of forfeiting The Complex and his Tall Oaks property instead of making the $10 million payment as a substitute res but choose the later.

Next, Gabe Elstein argues the court should impose a probationary sentence because of the impact the indictment has had on his life, his family and The Complex.  However, the case law is well settled that the collateral consequences a defendant experiences because of his criminal conduct are impermissible factors for the courts to consider for sentencing purposes.  The *Musgrave* court has made it clear that that "[t]he

collateral consequences of the defendant's prosecution and conviction are 'impermissible factors' when fashioning a sentenced that complies with the directive that "the district courts must explain, based on permissible considerations, how its sentence 'meshe[s] with Congress's own view of the crimes' seriousness.'" 761 F.3d 602, 608 (6th Cir. 2014).

In *Musgrave*, the district court ignored a guideline range of 57 to 71 months imprisonment in and imposed a one-day sentence "with credit for the day of processing." *Id.* at 608. In considering the need for the sentence to reflect the seriousness of the crime, promote respect for the law and provide just punishment, the district court noted that Musgrave had no criminal history, had decades and decades of community service. *Id.* at 606. In considering just punishment, the court relied upon the fact that he had lost $300,000 of his own money in the failed investment, had "been through four years of hell", had incurred substantial legal fees, was likely to lose his CPA license, would be required to pay $1.7 million in restitution, would be a convicted felon for life, he suffered from sleep apnea and employees at another of his companies relied upon him. *Id.* The Sixth Circuit found these considerations impermissible and in vacating and remanding the case back to the district court for resentencing. It reasoned that, '[N]one of these things are [his] sentence. *Id.* at 608. 'Nor are they consequences of his sentence', a diminishes sentence based on these considerations does not reflect the seriousness of his offense or effect just punishment.' (citation omitted). *Id.*

The Tenth Circuit, together with the Frist, Sixth, Seventh, Eleventh Circuits, has weighed in on the issue of district courts improperly relying upon the collateral consequences of prosecuting and convicting defendants.  In remanding a probationary sentence for a defendant convicted of one count out of sixty-three counts of bribery in *United States v. Morgan*, 635 Fed. Appx. 423 (2015), the Tenth Circuit found the district court erred when it determined the defendant "was adequately punished by the heightened publicity the case received and the loss of his law license and physical and financial heath as a result of his prosecution and conviction." *Id.* at 444.  The Tenth Circuit also found that the district court placed undue emphasis on the 482 letters it received requesting leniency.  The district court stated, "I look at this book of letters. I've thought often, I don't think that would know 482 people to even ask for a letter, much less get a positive one from all of them back.  You are well loved in the community and many communities." *Id.* at 458.

The Tenth Circuit reasoned that a defendant that has more to lose because of his standing in the community or wealth than those "who have nothing left to lose" is not entitled to leniency. *Id.* at 444.

The Frist Circuit has held that "[I]t is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reason that white-collar offenders suffer greater reputational harm or have more to lose by conviction." *United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012).

> [N]o "middle class" sentencing discounts are authorized. Business criminals are not to be treated more leniently than members of the "criminal

27

class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity. It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class. But in this instance we must fight our nature. Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

*United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) (citations omitted).

Application of the sentencing guidelines is intended to be neutral when it comes to the social-economic standing of defendants. USSG §§ 5H1.2 ("[e]ducation and vocational skills are not ordinarily relevant in determining whether a departure is warranted"), 5H1.5 ("[e]mployment record is not ordinarily relevant in determining whether a departure is warranted"), 5H1.10 (socio-economic status is "not relevant in the determination of a sentence").

## CONCLUSION

Blaming his cerebral cortex and Dale Gordon for his criminal conduct does not excuse or mitigate Gabe Elstein's eight years of criminal conduct or justify a departure from the sentencing guidelines. His cerebral cortex was fully engaged in executive functioning throughout the conspiracy in his aggravated role as a leader and organizer of his eight-year conspiracies. Gabe Elstein was the one who was looking to team up with Dale Gordon's business acumen so he could greatly expand his fledgling marijuana business from 40 pounds to 5,000 pounds and obtain the financial success his parents couldn't give to him.

He has failed to carry his burden of satisfying the exceptional case hurdle for family ties and responsibilities, charitable work or social-economic standing for the court to depart from the guideline range of 87 to 106 months to a probationary sentence. The collateral consequence resulting from his criminal conduct are impermissible factors for the court to consider in fashioning a sentence. The satisfaction of the United States' forfeiture claim is not a basis for a downward departure under the Sentencing Guidelines.

Dated this 25th day of September, 2024.

TRINA A. HIGGINS
United States Attorney

/s/ *Cy H. Castle*
Cy H. Castle
Assistant U.S. Attorney

<u>Certificate of Service</u>

I, Cy H. Castle, emailed a copy of this sealed filing to Gabe Elstein's attorneys, Joel

Kittrell and Jeremy Delicino.